# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 17-1848V
Filed: October 9, 2019
PUBLISHED

| | |
|---|---|
| ORANGIE ROBINSON,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Special Master Horner<br><br>Finding of Fact; Shoulder Injury Related to Vaccine Administration; SIRVA; Influenza (flu) Vaccine; Onset |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*
*Mollie Danielle Gorney, U.S. Department of Justice, Washington, DC, for respondent.*

## **FINDING OF FACT**[1]

      On November 29, 2017, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012), alleging that as a result of her January 10, 2017[2] influenza ("flu") vaccination she suffered right shoulder pain. Respondent recommended that compensation be denied, arguing, *inter alia*, that there is not preponderant evidence that petitioner's shoulder pain began within in a timeframe that would support a finding of vaccine causation, namely 48 hours. For the reasons described below, I now issue the below finding of fact. I conclude that petitioner experienced onset of shoulder pain on the date of her vaccination.

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Although the vaccination date was alleged to be October 11, 2016 in the initial petition, the medical records and affidavits filed indicate that the vaccination at issue was administered on January 10, 2017. On August 1, 2019, petitioner filed an amended petition correcting the date of administration. (ECF No. 32.)

## I. Procedural History

Initially this case was assigned to Special Master Millman. (ECF No. 4.) On January 29, 2018, petitioner filed her affidavit, proof of vaccination, and medical records in support of her petition. (ECF No. 7; Exs. 1-6.) On the same day, petitioner filed a Statement of Completion. (ECF No. 8.)

On January 30, 2018, Special Master Millman issued an order discussing the merits of the case. (ECF No. 9.) Special Master Millman focused on petitioner's January 30, 2017 visit, 20 days after vaccination, to her primary care physician ("PCP"), Dr. Nagashree Chandrashekar, at St. John Providence – Omni Medical Center ("Omni Medical"),[3] complaining only of a right ear wound with no mention of any right shoulder pain. (*Id.* at 1-2.) Special Master Millman found the silence in the January 30, 2017 medical record regarding petitioner's shoulder pain "highly puzzling in light of petitioner's affidavit in which she says she contacted Dr. Chandrashekar after receiving flu vaccination and let her know that her arm still hurt and kept contacting Dr. Chandrashekar…" (*Id.* at 4.)

On April 12, 2018, an initial status conference was held before Special Master Millman, where she discussed her January 30, 2018 order with the parties. (ECF No. 11.) Petitioner requested 60 days to submit phone records from Dr. Chandrashekar. (*Id.*) On May 5, 2018, petitioner filed two motions for authority to issue subpoenas to obtain petitioner's phone records and records of telephonic communications between petitioner and Omni Medical. (ECF Nos. 12-13.)

On September 25, 2018, petitioner filed the subpoenaed phone records, two witness affidavits from petitioner's sister, Myrtle Robinson, and petitioner's daughter, Benair Covington, and a status report summarizing the obtained phone information. (ECF Nos. 19-20.) Petitioner stated the records showed petitioner calling Dr. Chandrashekar's office on twenty separate occasions between January 10, 2017, and March 22, 2017. (ECF No. 20, p. 2-3.)

On October 9, 2018, petitioner filed a Motion for Discovery, requesting authority to obtain Omni Medical's phone records from January 10, 2017, to April 1, 2017, and to depose Dr. Chandrashekar as well as Stanley Nicole Dolly, practice and office manager at Omni Medical. (ECF No. 21.) Petitioner's motion was granted. (ECF No. 22.)

On May 7, 2019, respondent filed a Rule 4 report, recommending that entitlement to compensation be denied. (ECF No. 26.) Respondent argued that petitioner failed to establish a Table SIRVA claim in light of petitioner's history of neurological symptoms in her hands, diagnosis of carpel tunnel syndrome ("CTS"), and complaints of pain beyond her shoulder. Respondent also contested petitioner's onset of pain being within 48

---

[3] The record refers to Dr. Chandrashekar's practice as both PHMC-Providence Hospital and Medical Center and St. John Providence – Omni Medical Center. (*See* Ex. 1, p. 2; Ex. 2.) Additionally, Omni Medical changed its name and is now Ascension Omni Medical. (Ex. 15, p. 6.)

2

hours, raising in particular the same points noted in Special Master Millman's prior January 30, 2018 order. (*Id.* at 7-9.) Additionally, respondent stated that petitioner failed to establish causation-in-fact, arguing, again, that "petitioner's intervening medical visit is inconsistent with a finding of immediate post-vaccination pain or functional limitation," and petitioner had not offered any medical opinion, other than speculation, or expert report to support causation. (*Id.* at 10-12.)

On June 6, 2019, this case was reassigned to my docket. (ECF No. 28.) Petitioner filed a status report on June 14, 2019, confirming that depositions were conducted and requesting a ruling as to the onset of petitioner's injury. (ECF No. 29.) On July 1, 2019, petitioner filed the transcripts of the depositions of Dr. Chandrashekar and Stanley Nicole Dolley. (ECF No. 30; Exs. 14-15.)

On August 1, 2019, petitioner filed a motion for a ruling on the record seeking a finding of fact that the onset of her shoulder injury was within 48 hours of her January 10, 2017 flu vaccination. (ECF No. 34.) Respondent filed a response to petitioner's motion on August 22, 2019, and petitioner filed a reply on September 18, 2019. (ECF Nos. 36, 37.)

Accordingly, this case is now ripe for a finding of fact.

## II. Factual History

I have reviewed the entire record and I find the following most informative and relevant to determine the limited factual question at issue.

### a. Medical Records

On January 10, 2017, petitioner visited her PCP, Dr. Chandrashekar for an annual exam as a new patient. (Ex. 2, pp. 2, 4.) Petitioner reported numbness in her hands and that she had a prior EMG/NCV study, but that she did not know the results. (*Id.* at 4.) Upon physical examination, Dr. Chandrashekar indicated normal results relating to petitioner's musculoskeletal system. (*Id.* at 5.) Petitioner was administered a flu vaccine in her right deltoid. (*Id.* at 6; Ex. 1, p. 1.) Petitioner was scheduled to return for a visit on March 23, 2017. (Ex. 2, p. 6.)

About three weeks after vaccination, on January 30, 2017, petitioner returned to Dr. Chandrashekar for a follow up visit relating to a wound on her right ear. (*Id.* at 10.) Petitioner was also worried about getting shingles. (*Id.*) Under review of systems, Dr. Chandrashekar emphasized that petitioner reported ear pain and noted that there was "open wound on ear; less than 0.5cm." There was a similar notation regarding petitioner's numbness in her hands and no results from EMG/NCV. (*Id.*) With regard to petitioner's musculoskeletal system, Dr. Chandrashekar noted normal exam results, similar to the January 10, 2017 visit. (*Id.* at 13.) Dr. Chandrashekar noted "rash (dry skin in calf) and lesion (scratch with erythema on right pinna, tender, no drainage)" upon inspection and palpation. (*Id.*)

On March 2, 2017, almost two months post-vaccination, petitioner visited Dr. Chandrashekar with complaints of tingling and numbness in her right arm, which petitioner attributed to her flu shot. (*Id.* at 16.) Petitioner also reported having some numbness in her right fingers but denied having any neck pain. (*Id.*) Under the review of systems, in addition to the previous note about numbness in hands and no results regarding a previous EMG/NCV, Dr. Chandrashekar added that petitioner reported "weakness (feels her arm is slightly weaker)." (*Id.*) Upon physical examination, petitioner had normal tone, but limited range of motion in her right arm and shoulder and tenderness in her right paraspinal neck. (*Id.* at 17.) Petitioner was assessed with "paresthesia of upper limb – was told it is not from flushot! [sic.] Possible inflammation" and was referred for a physical therapy and a neurology consult. (*Id.*) Additionally, a bilateral upper extremity EMG/NCV was ordered for petitioner's right upper extremity numbness. (*Id.*)

On April 11, 2017, petitioner, by referral from Dr. Chandrashekar, visited Dr. William Higginbotham, III, at the CORE Institute and reported that she had right shoulder pain since January 10, 2017, after a flu vaccine. (Ex. 3, p. 2.) Petitioner reported that she experienced right shoulder pain for the duration of three months. (*Id.*) Upon a shoulder exam, Dr. Higginbotham found generalized right shoulder tenderness. (*Id.* at 3.) Petitioner was diagnosed with pain in the right shoulder and myositis of the right shoulder. (*Id.* at 4.) Dr. Higginbotham stated:

> Damage of [petitioner's] shoulder shows that she has diffuse complaints of pain mostly around the deltoid musculature distal to the greater tuberosity. There is no swelling or mass present. [Petitioner] has what appears to be normal range of motion her shoulder she limited because of complaints of pain. Plain film x-rays appear to be negative I don't see evidence of any problems on those films. I don't know why she has shoulder pain. It almost appears to be some type of unusual myositis or reaction.

(*Id.*)

The next time petitioner visited Dr. Chandrashekar was on April 17, 2017 for a follow up appointment for her CTS. (Ex. 2, pp. 17-20.) Petitioner was recorded as having limited range of motion in her right arm and shoulder and tenderness in her right paraspinal neck. (*Id.* at 21.) Dr. Chandrashekar assessed that petitioner had shoulder joint pain and bursitis present on her x-ray. (*Id.*)

On May 5, 2017, petitioner returned to the CORE Institute to review her right shoulder MRI with Dr. Sean Bak. (Ex. 9, p. 1.) Dr. Bak indicated that petitioner "had pain ever since she had an influenza it [sic.] immunization in [right] shoulder back in January." (*Id.* at 3.) Petitioner's MRI "showed some tendinosis and bursitis but no significant structural problem and Dr. Bak noted that petitioner did not have a frozen

shoulder. (*Id.*) Dr. Bak noted that the date of petitioner's right shoulder injury was January 10, 2017, after receiving flu vaccination. (*Id.* at 1.)

Petitioner had an initial physical therapy evaluation on June 13, 2017. (Ex. 4, p. 71.) Again, petitioner was diagnosed with right shoulder bursitis and the date of injury was January 10, 2017. (*Id.*) Additionally, petitioner reported that she had pain in her right shoulder, which started in January after receiving a flu shot. Petitioner reported that her symptoms had gotten progressively worse by that time and the "symptoms come and go inconsistently." (*Id.*) Petitioner's treatment plan consisted of two to three therapy sessions a week for four weeks. (*Id.*) On July 18, 2017, after petitioner's twelfth physical therapy session, she "reported decrease in symptoms and demonstrated increased functional activity tolerance following treatment." (*Id.* at 41.)

Petitioner visited Steven Plomaritis, D.O., as a new patient for an initial evaluation on October 26, 2017. (Ex. 6, p. 2.) Petitioner reported that she received a flu shot in January 2017 and had "an ache but it never improved." (*Id.*) Dr. Plomaritis noted that "[t]here is tenderness to palpation about the area of her flu shot and trapezius and the deltoid." (*Id.*) Dr. Plomaritis ultimately diagnosed petitioner with right shoulder pain, AC arthritis, possible rotator cuff tear, and cervical spondylosis. (*Id.*) Petitioner saw Dr. Plomaritis again for a follow-up visit on November 20, 2017. (*Id.* at 1.)

### b. Petitioner's Affidavits

Petitioner averred that she received a flu vaccine in her dominant arm on January 10, 2017, after a regular check-up at Dr. Chandrashekar's office. (Ex. 5, p. 1.) Petitioner did not want the flu shot because she never had it before and heard it was not always effective, but Dr. Chandrashekar insisted. (*Id.*; Ex. 19, p. 1.)

Petitioner immediately felt pain and complained that the pain was throbbing, but petitioner said that Dr. Chandrashekar assured her pain would only hurt for a little while.[4] Petitioner stated that after she got home, the pain in the area where she received the shot continued to hurt non-stop without relief and she contacted Dr. Chandrashekar. (Ex. 5, p. 1; Ex. 19, p. 1.) Again Dr. Chandrashekar said that petitioner's arm would be alright eventually. (*Id.*)

Petitioner averred that her pain did not go away (and, in fact, worsened) and that she continued contacting Dr. Chandrashekar's office, but that she had difficulty reaching the office staff by phone "and still she ignored my complaints." (Ex. 5, p. 1; Ex. 19, p. 1.) Petitioner indicated that she intended for her January 30, 2017 appointment to be an opportunity to discuss her shoulder pain; however, she also discussed the wound on her ear and her concern that she had contracted shingles. (Ex. 19, p. 2.)

---

[4] Specifically, in her initial affidavit, petitioner indicated that "after receiving the shot I immediately felt the pain and told Dr. Chandrashekar that the pain was still throbbing like I was continuously getting the shot over and over in the same place." (Ex. 5, p. 1.) However, in her supplemental affidavit, petitioner confirmed that Dr. Chandrashekar did not herself administer the vaccination. (Ex. 19, p. 1.) Petitioner averred that she spoke to Dr. Chandrashekar in the hallway after receiving the vaccination. (*Id.*)

5

Petitioner indicated that she had negative interactions with her healthcare providers throughout the period.  (Ex. 5, p. 2.)  At some unspecified point in time, she conducted internet research regarding shoulder injuries following flu vaccination.  (Ex. 5, p. 1.)  She felt that Dr. Chandrashekar did not believe her and that Dr. Chandrashekar did not take her complaints seriously because she was not familiar with this type of injury.  (*Id.* at 1-2.)

### c. Family Member Affidavits

<u>Myrtle Robinson's Affidavit</u>

Petitioner's sister, Myrtle Robinson, stated that she remembered petitioner receiving the flu shot at issue because she also had a flu vaccination at about the same time (January 2017).  (Ex. 12, p.1.)  Ms. Robinson further indicated that petitioner mentioned her arm being sore and Ms. Robinson assured petitioner that "it would go away eventually because mine hurt too for about an hour," but after a couple of days, petitioner told her sister that her arm was still hurting.  (*Id.*)  Ms. Robinson stated that "after a couple of weeks Orangie told me she was having difficulty carrying her groceries in the house," and "was only able to carry one or two bags in at a time and she was only able to use the opposite arm of where she got the shot."  Ms. Robinson affirmed that petitioner "has been complaining about the pain in that arm ever since she got that shot."  (*Id.*)

<u>Benair Covington's Affidavit</u>

Petitioner's daughter, Benair Covington, averred that she and her mother speak on a regular basis and that she "has been complaining about this shot from day one of the shot" and that "this pain she is experiencing in her right shoulder has become a fixed part of her every day life."  (Ex. 13, p. 1.)   Similar to Ms. Robinson, she also noted that petitioner has struggled with bringing in her groceries since the vaccination.  (*Id.*)  She also confirmed that petitioner had related to him that she spoke to the doctor about her shoulder pain on the date of her vaccination.  (*Id.*)

### d. Petitioner's Subpoenaed Cellular Phone Records

According to petitioner's cellular phone records, petitioner made a phone call to Dr. Chandrashekar's office at the number 248-559-6664 ("old office number") at 4:47p.m. and again at 8:45p.m. on January 10, 2017.  (Ex. 11, pp. 1.)  Petitioner called Dr. Chandrashekar's office at the number 248-849-7400 ("new office number") on January 25, 2017 at 1:56p.m. and again at 2:04p.m.[5]  (*Id.* at 7.)  Petitioner called the old office number at 10:41p.m. and at 10:42p.m. on January 28, 2017 and at 2:00p.m. on January 30, 2017.  (*Id.* at 8-9.)  And then petitioner called the new office number at 1:40p.m., 2:30p.m., 2:31p.m., 2:40p.m., 3:33p.m., 5:40p.m., 6:20p.m., 8:42p.m., and

---

[5] Both Dr. Chandrashekar and Ms. Dolly (office manager) confirmed these telephone numbers as the "old" and "new" office numbers respectively.  (Ex. 14, p. 20; Ex. 15, pp. 7, 17.)

8:54p.m. on February 16, 2017.  (*Id.* at 18-19.)  She called the new office number again on 1:36p.m. on February 18, 2017, at 2:37p.m. on February 23, 2017, at 8:14p.m. on March 1, 2017, and at 4:36p.m. on March 3, 2017.  (*Id.* at 20, 22, 27-28.)

    **e. Deposition Testimony**

On May 16, 2019, the depositions of Dr. Chandrashekar and Manager Dolly were held at Dr. Chandrashekar's office in Southfield, Michigan.

Dr. Nagashree Chandrashekar

Dr. Chandrashekar testified that she saw petitioner as a first-time patient for a physical on January 10, 2017.  (Ex. 14, pp. 7-8.)  Dr. Chandrashekar did not have an independent recollection of petitioner's January 10, 2017 visit apart from her records.  (*Id.* at 9.)  Dr. Chandrashekar ordered a flu shot, which was administered to petitioner on the same day after the physical by medical assistant Angela Johnson.  (*Id.* at 9-10.)  Dr. Chandrashekar testified she could not remember whether she saw petitioner on January 10, 2017, after petitioner received her vaccination.  (*Id.* at 11.)

Dr. Chandrashekar testified that she next saw petitioner 20 days later, on January 30, 2017, for a right ear wound, and that petitioner was also worried about having shingles.  (*Id.* at 13.)  Dr. Chandrashekar testified that according to the records, petitioner had hand numbness but there was no mention of shoulder pain during this visit.  (*Id.* at 14.)  However, Dr. Chandrashekar did not specifically remember the January 30, 2017 visit or whether petitioner told her about experiencing any shoulder pain that day.  (*Id.* at 14-15.)

She explained that her practice is to note the reason for a patient's visits under the history of present illness ("HPI") section and specific complaints under the review of systems section, and she would focus on these complaints during her physical examination.  (*Id.* at 22.)  Based on her records, Dr. Chandrashekar indicated that, since she had completed a full physical examination on January 10, 2017, she would not have checked petitioner's shoulder again given that petitioner's complaint was regarding a scratch in her ear.  (*Id.* at 16-18.)

Dr. Chandrashekar further explained, however, that she has a practice of carrying over notations from previous visits, altering the notes depending on what the patient subsequently reports.  (*Id.* at 16-17.)  Dr. Chandrashekar could not recall whether she performed a shoulder exam at the January 30 appointment, but testified that "I might have checked" petitioner's shoulder.  (*Id.* at 17.)  However, based on her records, she indicated that she didn't find anything abnormal.  (*Id.*)

Dr. Chandrashekar also indicated that she saw petitioner on March 2, 2017, ahead of petitioner's next scheduled appointment, because petitioner had tingling and numbness in her right arm.  (*Id.* at 18.)  Dr. Chandrashekar confirmed that she

documented petitioner reporting that the flu shot gave her pain and some numbness in her right arm and fingers. (*Id.*)

Dr. Chandrashekar testified that petitioner "told me that she had pain immediately, but I told her I do not remember that; and she said she called the office many times and I told her if I had got the message I would have called her. That's all I told her …Yeah, I could not remember. If I had called her then it will show up in the record if I documented it." (*Id.* at 19.) Dr. Chandrashekar could not recall talking to petitioner on the phone in relation to petitioner's shoulder pain and her vaccination. (*Id.* at 23-24.)

Stanley Nicole Dolly

Stanley Nicole Dolly testified that she's the practice manager for Ascension Omni Medical for over nine years and she has various duties including managing, hiring, firing, and budgeting. (Ex. 15, pp. 6-7.) Ms. Dolly recalled that she had a conversation with petitioner in the exam room regarding pain in petitioner's shoulder in March and shortly after petitioner requested medical records. (*Id.* at 8-9.)

Ms. Dolly remembered petitioner asking for the lot number for the vaccine petitioner received, but Ms. Dolly could not recall when such conversation took place. (*Id.* at 10-11.) Ms. Dolly testified that during their conversation in the exam room, petitioner stated she had pain in her shoulder and when Ms. Dolly asked petitioner if she knew who gave her the injection, petitioner did not provide the information because petitioner specifically did not want to "get anybody in trouble." (*Id.* at 11-12.) Ms. Dolly further testified that it was not typical for her to enter the exam room, but explained that she entered the room after petitioner made a complaint to the physician where she would usually console the patient or see if there is anything to be done to make things better. (*Id.* at 20.)

Ms. Dolly provided the parties with a copy of the records concerning appointments for petitioner, which was marked as Deposition Exhibit Number 1. (*Id.* at 24.) The record logs any time a call was made to make an appointment but does not track whether an appointment was made via phone or walk-in and does not give any information concerning the exact nature of the visit. (*Id.* at 25-27.)

### III.   Legal Standard Applied

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. 42 U.S.C. § 300aa-11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." 42 U.S.C. §

300aa-13(b)(1)(A).  The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony.  See *Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (*i.e.*, presenting all relevant information on a patient's health problems).  *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Doe v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"); *Rickett v. Sec'y of Health & Human Servs.*, 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion).  This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions.  *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras*, 26 Cl. Ct. at 543 ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred").  Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).

## IV.    Finding of Fact

In light of the above-discussed legal standard and based on my review of the entire record, I find preponderant evidence that petitioner's alleged vaccine-caused shoulder pain began within 48 hours of her January 10, 2017 flu vaccination.  In fact, despite respondent's contention that petitioner's onset of shoulder pain was not within 48 hours, the record supports the finding that petitioner experienced shoulder pain on the date of her vaccination.

Petitioner alleged that after receiving the vaccination, she immediately felt pain in her arm and that she immediately complained to Dr. Chandrashekar about such pain. Although the first time Dr. Chandrashekar recorded petitioner's shoulder pain was during the March 2, 2017 visit, ultimately, Dr. Chandrashekar could not recall whether she spoke to petitioner immediately after petitioner had her flu shot.  (Ex. 14, pp. 10-11.)

Significantly, petitioner's cellular phone records indicate that petitioner called Dr. Chandrashekar's office twice on January 10, 2017, providing some support for petitioner's recollection of making an immediate complaint of shoulder pain. Petitioner's records and Dr. Chandrashekar's testimony specify that petitioner received her flu vaccine at 3:14p.m. on January 10, 2017. (Ex. 1; Ex. 14, pp. 26-27.) Petitioner's phone records indicate that the first call on January 10, 2017 was at 4:47p.m.[6] (Ex. 11, p. 1.)

Additionally, petitioner's treating physicians' records, taken as a whole, support petitioner's recollection of experiencing shoulder pain on January 10, 2019, the date of her vaccination. In reporting the history of her pain to her orthopedist, petitioner indicated that her pain started "since" her flu shot. (Ex. 3, p. 2; Ex. 9, p.1.) Additionally, Dr. Bak detailed petitioner's pain duration as three months as of petitioner's first visit on April 11, 2017, where three months would place onset of pain around January 10, 2017. (Ex. 3, p. 2.) And petitioner's physical therapy records listed the vaccination date as the injury date. (Ex. 4, p. 71.) Also, the first time petitioner is recorded to have reported shoulder pain on March 2, 2019, petitioner associated her pain to her vaccination at that time. (Ex. 2, p. 16.) Ms. Dolly's testimony confirms that petitioner insisted that her shoulder pain was due to her flu vaccination. (Ex. 15, pp. 11-12.)

Respondent argues that these records should carry less weight, because they were recorded after an eight-week delay in seeking treatment, after an intervening (January 30) appointment where no complaint of shoulder pain was recorded, and potentially after petitioner had an opportunity to research her injury on the internet. (ECF No. 36, p. 9.) However, a delay in seeking treatment of shoulder pain or SIRVA is not novel and in fact, two or three months is not an unusual amount of time to delay treatment. *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 1835179, at *6 (Fed. Cl. Spec. Mstr. Jan. 18, 2018) ("[…] a delay in treatment of several months [is not] to be dispositive in and of itself regarding the question of onset in a SIRVA case."). Nor should petitioner's use of internet research automatically be viewed as suspect.[7]

As respondent notes, petitioner did have an intervening medical appointment (on January 30) between the visit where she received her vaccination (on January 10) and the visit where she is recorded to have first complained of shoulder pain (on March 2). This pattern of treatment could constitute some evidence contrary to petitioner's recollection; however, in this case, as discussed above, there is evidence that petitioner reported shoulder pain to her doctor immediately, including petitioner's affidavit affirming

---

[6] Petitioner did consistently aver that she contacted the doctor's office after she returned home on the evening of her vaccination to complain about her shoulder pain. (Ex. 5, p. 1; Ex. 19, p. 1.) Respondent, however, asserts a plausible alternative explanation for petitioner's two January 10 phone calls to her doctor's office. (ECF No. 36, pp. 8-9.) Nonetheless, respondent's proposed explanation is circumstantially supported at best. Other than petitioner's affidavit, there is no evidence indicating the substance of the telephone calls at issue. The phone records confirm only the fact of the relevant telephone calls. In any event, the fact of the calls is not itself dispositive.

[7] Respondent does not indicate why he ascribes significance to the fact of petitioner's online research. (ECF No. 36, p. 9.)

that petitioner raised complaints about pain in her arm immediately after vaccination and petitioner's phone records confirming phone calls to Dr. Chandrashekar's office on the evening of the date of vaccination. Significant to that point, Dr. Chandrashekar testified only that she could not recall speaking to petitioner subsequent to her vaccination on January 10, 2017. She did not assert that such interaction did not occur.

Moreover, Dr. Chandrashekar testified to carrying over notations from prior evaluations, could not recall the details of the January 30 appointment, and testified that she "might have" examined petitioner's shoulder on that date. Therefore, there is some basis for questioning the accuracy and completeness of notations relating to petitioner's shoulder exam or fact of any shoulder exam. *See Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (Fed. Cl. 1991) *aff'd* 968 F.2d 1226 (Fed. Cir. 1992) (noting that "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance … the fact that reference to an event is omitted from the medical records may not be very significant."). Additionally, this record is an outlier in that petitioner's subsequent treatment records consistently record onset occurring on or about January 10, 2017. Notwithstanding the single intervening appointment, the overall course of treatment reflected in the records is consistent with an immediate onset.

## V.  Conclusion

In light of all of the above, I find that there is preponderant evidence that petitioner's alleged shoulder pain began on January 10, 2017.

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u><br>
Daniel T. Horner<br>
Special Master